## Richmond

### ADOLPH DAMMERAU

v.

### COMMONWEALTH OF VIRGINIA

No. 0963-85

Decided October 21, 1986

COUNSEL

Leslie M. Osborn (Harris and Matthews, P.C., on brief), for appellant.

Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.** —Adolph Dammerau was convicted by a Nottoway Circuit Court jury of feloniously burning personal property in a correctional facility while a prisoner, in violation of Code § 53.1-203. At the time of the incident leading to the conviction, Dammerau was incarcerated at the Nottoway Correctional Center. The proceedings which we now review were held in a

courtroom located within the confines of the correctional center. Based on the issues raised by Dammerau on this appeal, we find no reversible error.

Dammerau presents three questions for our consideration:

1. Whether holding the trial inside the Nottoway Correctional Center deprived Dammerau of his right to a public trial;

2. Whether the trial court erred in allowing the Commonwealth to elicit, during cross-examination of two defense witnesses, the number of times they had been convicted of felonies, and the names of those felonies; and

3. Whether the trial court committed reversible error in denying two jury instructions proffered by Dammerau.

I.

We note at the outset that Dammerau raises only the question of whether he was denied his constitutional right to a public trial. Therefore, we limit our review to that issue, and we do not express any opinion on other potential issues, such as the right to a fair trial, an equal protection claim, or the legality or propriety of holding trials away from the county seat.

■ The right to a public trial is guaranteed by the sixth amendment to the United States Constitution, and article I, section 8 of the Constitution of Virginia, and has a long history in the common law. *See generally State v. Lawrence,* 167 N.W.2d 912, 913-16 (Iowa 1969). The Supreme Court of Virginia defined the term "public trial" in *Jones v. Peyton,* 208 Va. 378, 158 S.E.2d 179 (1967). That court said: "The ordinary common-sense acceptation of the term 'public trial' is a trial which is not limited or restricted to any particular class of the community, but is open to the free observation of all." *Id.* at 380, 158 S.E.2d at 181; *see also Cumbee v. Commonwealth,* 219 Va. 1132, 1135, 254 S.E.2d 112, 115 (1979).

In *Jones,* the defendant had been tried behind the closed doors of the judge's chambers. Meanwhile, relatives of both the defendant and a co-defendant were sitting in the circuit court courtroom

in anticipation of witnessing the trial. 208 Va. at 379, 158 S.E.2d at 180. The Supreme Court reversed the conviction, holding that Jones' trial was not public in that members of the public had no "freedom of access" to attend the trial. *Id.* at 380, 158 S.E.2d at 181. The court emphasized that holding the trial in the judge's chambers was not a per se violation of the right to a public trial, but that, in the *Jones* situation, the public's "freedom of access" was impeded. *Id.* at 380-81, 158 S.E.2d at 181; *see also State ex rel. Varney v. Ellis*, 149 W. Va. 522, 142 S.E.2d 63 (1965) (impromptu trial held on Sunday in jailer's office violated the defendant's right to a public trial).

The court re-emphasized its refusal to adopt a per se rule in *Caudill v. Peyton*, 209 Va. 405, 164 S.E.2d 674 (1968). There, a trial was held in the judge's chambers (in keeping with the common practice of that court in nonjury cases), and a door was open leading to the courtroom that would allow any spectators to view the proceedings. The court held that the public's "freedom of access" to attend the trial was not shown to have been impeded, and affirmed the conviction. *Id.* at 407-08, 164 S.E.2d at 676; *see also Via v. Peyton*, 284 F. Supp. 961 (1968) (trial in chambers with open door leading to courtroom did not violate defendant's right to a public trial); *State v. Gibb*, 303 N.W.2d 673 (Iowa 1981) (locking of courthouse doors at 5:00 p.m. did not constitute denial of public trial during reading of jury instructions that evening where public was afforded access to courtroom through other entries).

█ Dammerau urges us to accept the reasoning of the Supreme Court of Ohio in *State v. Lane*, 60 Ohio St. 2d 112, 397 N.E.2d 1338 (1979). There, the defendants were convicted of escape in trials held in a makeshift courtroom located within the confines of the prison from which they had escaped. The Supreme Court of Ohio held that the trials violated the defendants' rights to a fair trial, to a public trial, and the right to equal protection. In reference to the public trial issue, that court stated:

> There are at least four policy reasons for safeguarding the need for public trials: (1) A public trial serves as an effective restraint upon a possible abuse of power; (2) a public trial assures testimonial trustworthiness by inducing fear of testimony falsely given; (3) a public trial makes the proceedings known to a possible material witness who might otherwise be

unknown to the parties; and (4) a public trial allows the public to learn about the functioning of their government.

*Id.* at 119, 397 N.E.2d at 1343 (citations omitted).

█ The *Lane* court went on to at least imply that the trials were, by their very nature, per se not public. *Id.* at 120, 397 N.E.2d at 1343-44. To the extent Dammerau suggests that we adopt this view, we decline to do so. The Supreme Court of Virginia, in *Jones* and *Caudill*, rejected just such a per se rule in deference to the so- called "freedom of access" test. *Caudill*, 209 Va. at 408, 164 S.E.2d at 676; *Jones*, 208 Va. at 380, 158 S.E.2d at 181. We continue to follow that test in Virginia.

Applying that test to the facts of this case, we find nothing in the record to indicate that Dammerau did not receive a public trial. The record contains little information concerning the surroundings of the courtroom, procedures followed, etc. We do know that an apparently bona fide courtroom, unlike the makeshift one in *Lane*, is located within the confines of the Nottoway Correctional Center. We also know that the trial judge specifically ordered that no shakedowns or sign-in requirements be conducted for anyone attending the trial. We contrast this situation with the one in *Lane* where "there were extensive physical and electronic admittance procedures which resulted in temporary confiscation of personal belongings, extensive waiting periods, partial strip searches and additional security clearances at various junctures which were offensive to the public and to the officers of the court." 60 Ohio St. 2d at 120, 397 N.E.2d at 1343. Additionally, in *Lane*, a sign on the courtroom door stated: "No One Is To Enter Here At Any Hours." *Id.* at 120, 397 N.E.2d at 1343-44. The record in the instant case contains no evidence of such factors that would tend to dissuade the public from attending the trial. As such, we find nothing to indicate that the public did not have the "freedom of access" to attend Dammerau's trial, and therefore we cannot hold that the trial was not a public one.

█ By so holding, we do not intend to imply that Dammerau, or other similarly situated appellants, need affirmatively demonstrate that prospective spectators did not attend the trial because of its location and surroundings. We recognize the difficulty in proving a negative such as this. Rather, the surroundings and circumstances of each situation must be examined to determine if

the public was inhibited from attending the trial so that "freedom of access" was effectively denied. In order to make such a finding, however, an appellate court such as this one must have before it a record containing ample evidence of the surroundings and circumstances of the trial proceedings. The record before us contains no such evidence.

## II.

Dammerau called two fellow inmates as witnesses at his trial. Upon cross-examination, the Commonwealth asked each witness whether he had previously been convicted of a felony, the number of times so convicted, and the names of the felonies. The witnesses answered accordingly. On appeal, Dammerau argues that the trial court erred in allowing the Commonwealth to elicit information regarding the number of times witnesses had been convicted of felonies and the names of those felonies. He contends that the impeachment of defense witnesses should be limited to whether the witness has been convicted of a felony, and the number of times so convicted. Thus, Dammerau places defense witnesses on an equal footing with a defendant himself. *See Sadoski v. Commonwealth*, 219 Va. 1069, 1071, 254 S.E.2d 100, 101 (1979); *Harmon v. Commonwealth*, 212 Va. 442, 446, 185 S.E.2d 48, 51 (1971).

Code § 19.2-269 states: "A person convicted of a felony or perjury shall not be incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit." The Supreme Court of Virginia has interpreted this statute to mean that witnesses other than the defendant may be asked the names of the felonies for which they have been convicted. *Johnson v. Commonwealth*, 224 Va. 525, 528-29, 298 S.E.2d 99, 101 (1982); *Hummel v. Commonwealth*, 217 Va. 548, 550-51, 231 S.E.2d 216, 217 (1977), *cert. denied*, 440 U.S. 935 (1979). While it is true, as Dammerau states, that *Johnson* and *Hummel* involved the cross-examination of prosecution witnesses, we find nothing in the rule of law enunciated in those cases, nor in Code § 19.2-269, that limits that rule to witnesses for the Commonwealth. As such, the trial court did not err in permitting the cross-examination of the defense witnesses to the extent that it did.

## III.

The court denied the following two instructions proffered by the defendant:

1. There is a rebuttable presumption that the fire was caused by accident. This presumption may be overcome by evidence showing that the fire was of incendiary origin and that the defendant was the guilty agent.

A fire of incendiary origin means one that was willfully or intentionally set.

2. When property is burned, the law presumes the fire was caused by accident rather than by a deliberate act.

In denying the proffered instructions, the court specifically found that the presumption of innocence and burden of proof instructions which were given incorporated those that were denied.

"In order to make out a case of arson it is essential not only that the evidence reveal that the fire was of incendiary origin, but it must also point unerringly to the guilty party." *Poulos v. Commonwealth*, 174 Va. 495, 499, 6 S.E.2d 666, 667 (1940). There is a presumption in the law that a fire is caused by accident, rather than by the deliberate act of an accused. *Simmons v. Commonwealth*, 208 Va. 778, 782, 160 S.E.2d 569, 572 (1968); *see also Cook v. Commonwealth*, 226 Va. 427, 431, 309 S.E.2d 325, 328 (1983). This presumption is rebuttable. *Knight v. Commonwealth*, 225 Va. 85, 89, 300 S.E.2d 600, 602 (1983).

We must decide whether the failure of the trial court to grant either or both of the proffered instructions constituted reversible error. In doing so, we are not unmindful of the general presumption of innocence governing a criminal trial, and the rebuttability of that presumption by the introduction of evidence establishing guilt beyond a reasonable doubt. The trial court in this case instructed the jury as follows:

The defendant is charged with the crime of willfully burning personal property while the defendant was a prisoner in a

state or local correctional facility. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

(1) that the defendant was a prisoner in Nottoway Correctional Center; and

(2) that the defendant burned personal property within Nottoway Correctional Center; and

(3) that the burning was done willfully.

The court also gave an instruction on the presumption of innocence.

We find that the presumption of innocence and burden of proof instructions, noting that the Commonwealth must prove the defendant "willfully" burned the property, by their very nature include the presumption that a fire is of accidental origin. In order to convict the defendant, the jury must have found beyond a reasonable doubt that the fire was not accidental, but was deliberately set by Dammerau. As such, the failure to grant a specific instruction regarding the origin of the fire presumption does not constitute reversible error.

*Affirmed.*

Hodges, J., concurred.

Coleman, J., dissenting.

The majority concludes that the appellant received a public trial based on a finding that the record contains "no evidence of such factors that would tend to dissuade the public from attending the trial . . . [and] nothing to indicate that the public did not have the 'freedom of access' to attend Dammerau's trial." I respectfully disagree.

The Nottoway Correctional Center is a medium security penitentiary completely surrounded by a perimeter fence with the traditional security of penal institutions. The permanent courtroom is totally within the confines of the penitentiary. I can conceive of few locations where freedom of access by the public is more restricted or few situations which tend to discourage or dissuade attendance by the public more than holding a trial in a

courtroom within the confines of a penitentiary. On the record before us, I would reverse the conviction for failure to afford the accused his fundamental constitutional rights to a public trial and fair trial. I would remand the case for a new trial with directions that the proceedings be held in a courtroom of the circuit court at the county courthouse in accordance with Code § 17-14.

The majority suggests that a reversal based on the public trial guarantee would result in the adoption of a rule that jury trials held in courtrooms within a penitentiary are *per se* invalid. Relying on *Jones v. Peyton* and *Caudill v. Peyton* the majority concludes that Virginia has rejected such a *per se* rule. In my opinion, the majority misconstrues the *Jones* and *Caudill* holdings which, at most, reject a *per se* rule only in regard to trials held in a judge's chambers. I do not construe *Jones* and *Caudill* to be so far-reaching as to preclude our holding as a matter of law that a jury trial held in a penitentiary for the purpose of trying an inmate for an offense allegedly committed within the prison is a denial of a public trial.

The practice of removing trials from the courthouse to a penitentiary, in the absence of any showing of overriding public necessity or justification, is, in my view, such an invidious practice and so offends traditional notions of fairness and the basic precepts of our criminal justice system that I would favor declaring that such trials are not public trials as required by the sixth amendment. "[T]he mere probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *State v. Lane*, 60 Ohio St. 2d 112, 115, 397 N.E.2d 1338, 1340 (1979). Short of the adoption of a *per se* rule that all trials held within a penitentiary are unconstitutional, I would, on the record before us and applying the "so-called freedom of access test" relied on by the majority, find that this trial was not public, absent a clear showing by the Commonwealth that the public's freedom of access to this trial was unimpeded.

The public trial provision of the sixth amendment envisions that all trials will be held under surroundings and circumstances which do not unnecessarily inhibit public attendance or freedom of access. Under the majority view, a trial is "public" if conducted where persons who are bold, adventurous, or inquisitive enough to do so, take the initiative to determine how to gain access to a place that is purposefully designed to be inaccessible. If trials are to be held within a penitentiary and are to be declared "public"

merely because as a matter of law the public was not excluded and would have been admitted had anyone chosen to attend, the guarantee of "public trial" is essentially worthless.

Furthermore, despite the disavowal by the majority that we are confronted with the issues of the right to a fair trial, the right to an impartial jury, equal protection, or the legality or propriety of holding trials away from the courthouse at the county seat, I believe that appellant has raised and properly preserved an objection that he was denied a fair trial, due process and an impartial jury. In fact, we only reach the sixth amendment public trial guarantee in the context of a fair trial and due process approach because "[the] public trial guaranteed in Federal criminal trials by the Sixth Amendment is so fundamental and essential to a fair trial that it is made applicable to state criminal trials through the due process clause of the Fourteenth Amendment." *Jones v. Peyton*, 208 Va. 378, 380, 158 S.E.2d 179, 180 (1967) (citations omitted). The appellant consistently asserted that the denial of a public trial deprived him of a fair trial and an impartial jury, and both he and the Attorney General addressed due process issues in brief and at oral argument. However, since the majority does not address this aspect of the case, I limit my comments to noting that I am persuaded by appellant's argument that he was denied a fair trial because holding the proceeding within the penitentiary (1) eroded the presumption of innocence, (2) compromised the jury's ability to remain impartial, and (3) chilled the right to obtain witnesses who could testify openly. I believe that the rationale of *Lane*, 60 Ohio St. 2d 112, 397 N.E.2d 1338 (1979), relied on by the appellant, is persuasive and more applicable to the facts presented than the holdings in *Jones* and *Caudill* relied on by the majority. I would, therefore, reverse the conviction for the additional reasons that the denial of a public trial under these circumstances deprived the appellant of a fair trial and due process.